# APPENDIX 2 TO EXHIBIT B

CROWLEY, HAUGHEY, HANSON, TOOLE & DIETRICH P.L.L.P.
ATTORNEYS AT LAW

45 DISCOVERY DRIVE · SUITE 200 · BOZEMAN, MONTANA 59718
P.O. BOX 10969 · BOZEMAN, MONTANA 59719-0969
TEL (406) 556-1430 · FAX (406) 556-1433
www.crowleylaw.com

STEPHEN M. BARRETT
COLBY L. BRANCH * #
GARY G. BROEDER
ALAN C. BRYAN #
KRISTY L. BUCKLEY
ASHLEY BURLESON
DAVID L. CHARLES
PAUL C. COLLINS
GARY M. CONNELLEY
RENEE L. COPPOCK
MARCIA J. DAVENPORT
MICHAEL S. DOCKERY
JOHN B. DUDIS, JR.
JON T. DYRE #
MARY SCRIM DYRE
SCOTT A. FISK
HEIDI R. GOETTEL
MICHAEL W. GREEN
ROBERT C. GRIFFIN
PETER F. HABEIN
SCOTT D. HAGEL
NATHAN S. HANEY
KEVIN P. HEANEY
KENNETH G. HEDGE *
JAMES R. HINTZ
BRIAN HOLLAND
LARRY A. HOLLE
STEVEN W. JENNINGS
DANIEL D. JOHNS
JOEL L. KALEVA
ALLAN L. KARELL
KIELY S. KEANE
PETER M. KIRWAN
WILLIAM D. LAMDIN III
KENNETH K. LAY
JOHN R. LEE *
JARED M. LE FEVRE
STEVEN J. LEHMAN
JULIE A. LICHTE
DENISE D. LINFORD #
MOLLY A. LITZEN
JASON P. LOBLE
SARAH A. LOBLE
CHRIS MANGEN, JR.
TINA M. MARTINEZ +
WILLIAM J. MATTIX
JOE C. MAYNARD, JR.
JOHN H. MAYNARD
JOSEPH P. MAZUREK
HEATHER A. McDOWELL
IAN McINTOSH
DANIEL N. McLEAN
MATTHEW F. McLEAN #
ROBERT G. MICHELOTTI, JR.
STEVEN R. MILCH
KIMBERLY S. MORE
DONALD R. MURRAY, JR.
JENNIFER M. NASNER *
KRISTIN L. OMVIG
JEFFERY J. OVEN #
JILL O. PETERSON
HERBERT I. PIERCE III
FRED C. RATHERT *
KENT A. REIERSON +
STEVEN P. RUFFATTO
GINA S. SHERMAN
JAMES P. SITES
GARTH H. SJUE *
LEONARD H. SMITH
MARTIN S. SMITH
CHRIS C. STONEBACK
CHRISTOPHER C. VOIGT #
DAVID M. WAGNER
NEIL G. WESTESEN
DIRK A. WILLIAMS
BRYAN P. WILSON
RONALD E. YOUDE
RETIRED
JAMES M. HAUGHEY
OF COUNSEL
GEORGE C. DALTHORP
JOHN M. DIETRICH
DAVID L. JOHNSON
GARELD F. KRIEG
ARTHUR F. LAMEY, JR.
LOUIS R. MOORE *
MYLES J. THOMAS
FRED E. WHISENAND *
OFFICES
500 TRANSWESTERN PLAZA II
490 NORTH 31ST STREET
P.O. BOX 2529
BILLINGS, MT 59103-2529
PHONE (406) 252-3441
100 NORTH PARK AVENUE
SUITE 300, P.O. BOX 797
HELENA, MT 59624-0797
PHONE (406) 449-4165
111 EAST BROADWAY
P.O. BOX 1206
WILLISTON, ND 58802-1206
PHONE (701) 572-2200
431 FIRST AVENUE WEST
P.O. BOX 759
KALISPELL, MT 59903-0759
PHONE (406) 752-6644
305 SOUTH 4TH ST. EAST
SUITE 100, P.O. BOX 7099
MISSOULA, MT 59807-7099
PHONE (406) 523-3600
Attorneys are licensed in Montana unless otherwise noted; * also licensed in North Dakota; # also licensed in Wyoming; + not licensed in Montana

October 11, 2007

**Privileged and Confidential: For Settlement Purposes Only**

Ken Snow
Lathrop & Gage, L.C.
2345 Grand Blvd., Ste. 2800
Kansas City, MO 64108-2612

RE: Summary of Early Discovery Information
*Burns & McDonnell v. Anderson Engineering and Corps of Engineers*
Our File No. 10-192-107

Dear Ken:

As you requested, I am writing to provide you with a summary of the information developed during the discovery process regarding "early discovery" of the survey error at issue in this case. This letter supplements the information previously provided in my December 20, 2005 letter to Greg Smith, which is incorporated by reference but, for brevity's sake, is not repeated verbatim. I am providing the summary to you for purposes of facilitating settlement discussions between all parties and its contents are subject to the provisions of Rule 408. Additionally, this letter is only intended to be an overview of the early discovery information and does not contain a detailed or exhaustive review of every deposition, deposition exhibit, or other document produced to date. Anderson Engineering may rely on additional and/or different facts to support its early discovery defense.

Anderson Engineering initially preformed survey services in January through March, 2002. Anderson Engineering performed some additional surveying in the late summer of fall of 2002. It appears that an error occurred when Anderson Engineering preformed the initial survey work in early 2002 and that this error impacted the entire site.

As you know, the project actually was constructed in two phases, the pump house project and the fish hatchery project. Elevation discrepancies first surfaced during the pump house project. The contractor on the pump house project, Johnson-Wilson, encountered a problem with a culvert and a temporary road. The design drawings showed the temporary road at a higher elevation than what actually existed. According to Gary Wilson, if Johnson-Wilson had constructed the culvert and temporary road according to the plans, the culvert would have been higher than the road. The error was significant enough that Johnson Wilson reported the problem to the Corps of Engineers and was instructed to "make it fit" without any inquiry into the cause of the problem. Don Streib did not report the problem with the culvert and the temporary road to anyone else at the COE.

The elevation error also surfaced during construction of the intake structure at the pump house itself. The intake structure was located several hundred yards away from the area where the problem occurred with the temporary road. Again, Johnson-Wilson discovered that the plans, which contained the elevation error, showed the existing ground at a higher elevation than the conditions on site. The nature and characteristic of the error was identical to the error discovered on the temporary road. This time, Johnson-Wilson and the COE could not rectify the error simply by "making it work," and the COE executed a change order with Johnson-Wilson to account for the elevation discrepancy. Gary Wilson testified that he informed the COE that the elevations on the plans were off.

Gary Wilson testified that the nature and characteristic of the error, and the fact that this was the second elevation discrepancy on the project, should have caused the Corp of Engineers to investigate the source of the error. He also stated that the error later discovered on the second phase of the project was the same error encountered on the pump house project and that the COE should have identified the problem based on its knowledge of elevation errors at the pump house. Mr. Wilson testified that standard practice in the construction industry is to investigate the cause of the problem, and if the COE had investigated the cause of the elevation errors at the pump house, the COE could have avoided the problems that later developed.

Sletten Construction began work on the fish hatchery portion of the project in August, 2003. Roger Meyer, the surveyor hired by Sletten, also discovered elevation errors, and did so almost immediately. Initially, Roger Meyer encountered problems with the elevations of some existing manholes and the layout of sewer line A. According to deposition exhibit 5, Mr. Meyer found as follows:

> A look at Fridays "as built" survey indicated a discrepancy in elevations for existing manholes shown on plans. Ran Level Loop from EXIST.MH. (U1.05) to NEW LIFT STATION (U1.04), and found overall discrepancy of approximately 1.5 feet in elevation.

(Deposition Ex. 5). Roger Meyer testified that he felt these elevation errors were significant and that he had confirmed the errors by running a level loop survey. Consequently, he reported the errors both to Sletten Construction and to the COE.

Roger Meyer testified that, in addition to this note, he also discussed the elevation discrepancy in a meeting with both Linder Hanks from Sletten Construction and with Don Streib. According to Mr. Meyer, Don Streib was disrespectful and Streib made Meyer feel as though Meyer was sticking his nose where it did not belong. Streib denied that any problem existed, told Meyer that another surveyor working on another phase had said the same thing, and concluded that "you surveyors can't agree on anything." Rather than trying to determine the cause of the errors, Steib directed Meyer to "make it work." In other words, Streib made the connection between the errors reported by Meyer and those that occurred on the pump house project but denied that any problem existed, attributing the discrepancies to the inability of surveyors to agree on anything. Thus, by August, 2003, the COE was aware of at least three different elevation errors on the project, and according to Roger Meyer the COE had been informed of the errors both at the pump house and at the fish hatchery. However, the COE failed to contact either Burns & McDonnell or Anderson Engineering.

Like Gary Wilson, Roger Meyer was frustrated with the COE's reaction to the information Meyer provided and by the COE's management style. Meyer discussed the elevation discrepancies with Oakland & Fisher in September, 2003, and continued to be frustrated by the COE's lack of response. Despite the fact that the COE was aware of similar problems on the pump house, the COE did not want to discuss the elevation discrepancies with Roger Meyer and left Meyer feeling as though the COE did not want to do any further investigation to determine the cause of the elevation discrepancies.

Additional elevation discrepancies arose in the fall of 2003. One issue was the lack of cover over a sewer line. Because the plans showed the elevation of existing ground as being higher than actually existed, Oakland & Fisher Construction raised a concern about the lack of cover over the sewer line. Roger Meyer testified that this issue was related to the site-wide survey error. Although the COE ultimately determined that there would be sufficient cover for the sewer line, this decision did not change the fact that it was again notified of a potential problem resulting from the elevation discrepancy.

Dean Oakland likewise testified that the elevation errors were apparent in 2003. Dean Oakland testified that he believed the COE failed to recognize, or even check into, the elevation issues and that as a result the problem was later exacerbated. Dean Oakland stated that the COE, via Don Streib, was aware of elevation errors in 2003. In fact, Dean Oakland testified that he was concerned in the fall of 2003 that the elevation error might be site wide, and that he discussed the potential magnitude of the elevation error with Linder Hanks and Rick McCullough from Sletten Construction. Dean Oakland was adamant that the Corps of Engineers was aware of the problems and that the Corps of Engineers should have done further investigation to determine the source of the problem. Likewise, Terry Klein testified that with "a little common sense" the Corps of Engineers could have checked into the problem to determine the source of the problem. As Mr. Klein noted in his deposition, in the fall of 2003 Don Streib had more information than anyone else about the various elevation errors that occurred during the project, and the COE should have investigated the cause of the problem.

Oakland & Fisher's position was clearly summarized by Chuck Neff and his October 7th,2004 letter. That letter stated, in relevant part:

> Now it has been confirmed that the initial site surveys published by the Corps were off by around 1.5 feet impacting the dirt cut and fill work to be performed over the entire approximately 98 acres of the project site. Beginning in September-October, 2003, Roger Meyer of the survey firm Guenzi-Meyer, Inc. ("Meyer") was finding elevation errors in the initial master site survey at the lift station and manhole no. 6 site of around 1.5 feet for which the Corps was notified in writing. Such site elevation problems continued through October 2003 when questions arose over the amount of cover for the sewer line and elevation for other manhole covers which complaints about site elevation error continued through to March 2004 with no response on input from the Corps to OFC or Sletten as to the problem.
>
> In March, 2004, OFC was installing sewer line C and elevations were found to be off over a foot. The Corps, after being informed, instructed OFC to increase the slope on line C to make it fit the original elevation specifications. This was the Corps' first response to this elevation problem.
>
> ***
>
> The faulty elevation specification set forth in the original specifications now have had a severe impact on almost every aspect of OFC's dirt work performed over the last year on this contract. It is doubly unfortunate to have Mod 16 come up to correct these elevations at this time when the original elevation errors were reported by OFC and Meyer in September of 2003
>
> ***
>
> However, OFC contends the survey discrepancies in elevation and the Corps' failure or reluctance to check out this problem when first discovered (as notified first in September, 2003) has cause OFC to be unable to perform its dirt work and pond piping in a timely and cost efficient manner, in extra work costs, rework costs and lost revenue has now been unfairly incurred by OFC.

(Deposition Ex. 18).

Anderson Engineering has disclosed two different survey experts, Craig Brown and Doug Smith, who both have opined that the elevation errors that occurred in the Spring of 2003 and the Fall of 2003 were significant enough that the COE should have investigated the cause of the errors and/or contacted Anderson Engineering. As Doug Smith noted in both his expert report and his deposition, once an error is discovered, the party in charge of the project (the COE in this case) must determine how to address the error. In this case, the errors discovered in the Spring and Fall of 2003 were

significant enough that the COE should have determined the nature and source of the errors. Errors do not get better with time, and the industry custom is to provide a surveyor with prompt notification of any mistakes to minimize the impact. Unfortunately, that did not happen here.

Based on the foregoing information, Anderson Engineering believes there is a substantial amount of evidence to demonstrate "early discovery" of the elevation error. The survey error was discovered in the Spring of 2003 during construction of the pump house project, and arose again in the late summer and early fall of 2003 during construction of the fish hatchery ponds. It is undisputed that neither Burns & McDonnell nor Anderson Engineering received notification of any of these discoveries. In fact, neither Burns & McDonnell nor Anderson Engineering received notice of any elevation discrepancies until the Spring of 2004, long after most of the concrete chimneys had been set in place. Had Burns & McDonnell and Anderson Engineering been notified of the elevation discrepancies when they were first encountered at the pump house project or, at worst, following Roger Meyers discovery of the problems with existing manholes and the layout of sewer line A, the error would have been corrected at a fraction of the cost.

It is undisputed that, at soon as Anderson Engineering was aware of any potential issues, it mobilized to the site almost immediately, quickly located the nature and source of the error, and rapidly provided corrected survey information to Burns & McDonnell. Had Anderson Engineering been able to perform these tasks in the Spring or Summer of 2003, the cost of remedying the survey error would have been significantly reduced.

Thank you for your time and attention to this matter. Please let me know if you have any questions.

Sincerely,

CROWLEY, HAUGHEY, HANSON,
TOOLE & DIETRICH P.L.L.P.

By [signature]
Matthew F. McLean

MFM/ge